UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

       -against-                                         20-cr-176 (LAK)

CAESAR DIAZ, and
MICHAEL HAWKINS,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

       Appearances:

              Micah F. Fergenson
              Assistant United States Attorney
              AUDREY STRAUSS
              ACTING UNITED STATES ATTORNEY

              David Arthur Ruhnke
              RUHNKE & BARRETT
              *Attorneys for Defendant Caesar Diaz*

              Jonathan Andrew Marvinny
              FEDERAL DEFENDERS OF NEW YORK, INC.
              *Attorneys for Defendant Michael Hawkins*

LEWIS A. KAPLAN, *District Judge.*

       Defendants Caesar Diaz and Michael Hawkins each is charged with one count of knowingly possessing a firearm after having been convicted of a felony. They jointly moved to suppress two guns obtained after a "stop and frisk" of both defendants and an arrest of Hawkins that

2

they argue violated their rights under the Fourth Amendment.[1]   The Court held a suppression

hearing at which four police officers testified for the government and one layperson testified for the

defendants.[2]  Defendants' motion is denied for the following reasons.

## Facts

ShotSpotter" is a GPS enabled sound detection system that the New York Police

Department ("NYPD") uses to identify and locate gunfire within the city of New York.[3]  Essentially

"a surveillance system," ShotSpotter "uses sophisticated microphones to record gunshots in a

specific area."[4]  When ShotSpotter detects a sound that may have been a gunshot, a report is

broadcast to NYPD officers on patrol that includes the approximate location of the alleged gunfire,

the elevation at which it was detected, and the number of rounds apparently discharged.[5]

---

[1]   Defendants moved to suppress "all physical evidence, including the guns, obtained as a result of the officers' unconstitutional conduct."  Defs.' Mem. [Dkt. 14] at 1.   The defendants have not argued, however, that any evidence apart from the guns resulted from unconstitutional conduct.  The Court therefore addresses only the question of whether the two guns should be suppressed.

[2]   Neither defendant testified at the suppression hearing.  Hawkins submitted a written affidavit in support of his contention that police officers unlawfully detained and frisked him and Diaz without reasonable suspicion and unlawfully arrested Hawkins without probable cause.  *See* Marvinny Decl. [Dkt. 13] Ex. B [hereinafter "Hawkins Decl."].   Diaz did not submit an affidavit.

[3]   *United States v. Rickmon*, 952 F.3d 876, 878 (7th Cir. 2020); *see also* Compl. [Dkt. 1] ¶ 4(a); Gov't Mem. [Dkt. 15] at 2 n.2.

[4]   *Rickmon*, 952 F.3d at 878.

[5]   Tr. at 5:15-19.

On the evening of October 20, 2019, two nearly identical ShotSpotter reports were broadcast to NYPD officers on patrol in the Bronx.[6] The first report, broadcast around 7:40 PM, stated that one round of apparent gunfire was detected at roof-level at 940 Reverend James A. Polite Avenue.[7] Officers who responded to the address encountered a three-story, single family home (the "940 Building"),[8] which shared a wall with a six story, walk up apartment complex at 936 Reverend James A. Polite Avenue (the "936 Building").[9] According to officers who testified at the suppression hearing, the neighborhood around the buildings is high in criminal activity, and the 936 Building in particular has been the subject of numerous police calls.[10]

The officers who responded to the first ShotSpotter report observed that the 940 Building appeared to have "no rooftop access."[11] The 936 Building, however, had a flat roof that the officers knew from prior experience was accessible by internal stairwell.[12] Understanding that

---

[6] Compl. ¶ 4(a); Tr. at 5:8-11, 8:5-6.

[7] Tr. at 7:25-8:15.

[8] Compl. ¶ 4(a); Tr. at 82:2-17.

[9] Tr. at 14:15-21, 15:2-17.

[10] *Id.* at 15:2-17, 105:15-106:2, 135:1-7.

[11] *Id.* at 107:9-12. The complaint describes the 940 Building's roof as "pointed." Compl. ¶ 4(a). A photograph submitted by the defendants shows that the 940 Building in fact has a flat roof that is behind pointed gables. Defs.' Mem. at 6.

[12] *Id.* at 135:1-7.

ShotSpotter locations are accurate to about a "half a block radius,"[13] the officers determined that the 936 Building was more likely than the 940 Building to have been the location of roof level gunfire and searched it from top to bottom.[14]   Finding no evidence to corroborate the ShotSpotter report, they departed.[15]

Around 8:51 PM, a second ShotSpotter report was broadcast again stating that one round of apparent gunfire was detected at roof level at 940 Reverend James A. Polite Avenue.[16] This time, Officers Stephen Bonczyk and Cynthia Lopez – both of whom heard the first ShotSpotter report but did not respond to it[17] – immediately drove to the address in a marked police car.[18]   Like the officers who responded to the first report, Officers Bonczyk and Lopez were familiar with the neighborhood, understood ShotSpotter locations to be approximate, and knew from experience that the 936 Building had a roof accessible by internal stairwell.[19]

---

[13]

*Id.* at 104:15-22.   The responding officers had significant experience responding to ShotSpotter reports.   *See e.g.*, *id.* at 5:20-6:6 (Officer Bonczyk testified that he had responded to more than 50 ShotSpotter reports prior to October 20, 2019); *id.* at 62:15-25 (Officer Lopez testified that she responded to about 10 ShotSpotter reports a month prior to October 20, 2019); *id.* at 103:15-104:2 (Sergeant Perez testified that she had experience responding to ShotSpotter reports and received also official training on the program prior to October 20, 2019).

[14]

*Id.* at 106:21-107:4, 135:1-20.

[15]

*Id.* at 106:23-107:24.

[16]

*Id.* at 8:25-9:11.

[17]

*Id.* at 4:18-5:11, 8:16-19, 63:23-64:9.

[18]

*Id.* at 4:18-5:5, 11:7-17.

[19]

*Id.* at 7:5-15, 13:3-23, 15:2-24, 63:10-18, 65:14-66:4.   Officer Bonczyk testified that, prior to October 20, 2019, he had been inside the 936 Building on its top floor, where he had seen

As Officers Bonczyk and Lopez pulled up to the 940 Building – about "two to three minutes" after the second ShotSpotter report was broadcast[20] – they saw Diaz and Hawkins exiting the front door of the 936 Building and entering a gated, "open-air vestibule area."[21] The officers saw no one exiting or entering the 940 Building, which they noticed had a roof that appeared partially slanted.[22]  From their moving police car, the officers observed Diaz – who had his hood on and his hands in his sweatshirt pockets – "turn[] his body slightly."[23]  They observed also Hawkins "pivot" and "hurry[]" as he walked toward the vestibule's front gate.[24]  Officer Lopez testified that she thought Hawkins's body pivot may have been an effort to hide himself when he saw their police car.[25]

Officers Bonczyk and Lopez parked and approached the 936 Building on foot.[26]  As they approached the vestibule, Officer Bonczyk observed that Diaz and Hawkins were still walking towards its front gate, and that both had their hands in their sweatshirt pockets.[27]  The government

---

internal stairwells leading to the roof.  *Id.* at 15:2-24.

[20]    *Id.* at 11:18-20.

[21]    Compl. ¶ 4(b); *see also* Tr. at 17:21-25, 19:15-16.

[22]    Tr. at 19:17-20:2, 66:16-21.

[23]    *Id.* at 18:1-6, 19: 2-6.

[24]    *Id.* at 18:1-6, 88:7-9.

[25]    *Id.* at 88:7-22; 97:11-17.

[26]    *Id.* at 21:24-22:6.

[27]    *Id.* at 22:1-17.

introduced security footage from the 936 Building showing the defendants exiting the 936 Building into the vestibule.[28]  Due to the positioning of the security camera – which was focused only on the front door of the 936 Building, opposite the front gate of the vestibule – neither the second half of defendants' passage toward the front gate nor the ensuing interaction with Officers Bonczyk and Lopez was captured.  According to Officer Bonczyk, Diaz was "creating a tension" in his sweatshirt with his hands, which Officer Bonczyk interpreted as an effort to "conceal his midsection."[29] Officer Lopez testified that, once the officers got to the gate, she recognized Diaz as having been arrested for assaulting a police officer in the past.[30]

While standing outside the vestibule's front gate, Officer Bonczyk asked Diaz and Hawkins to take their hands out of their sweatshirt pockets, which they did.[31]  When Diaz removed his hands from his sweatshirt, Officer Bonczyk saw the garment shift up, revealing a "bulge in his center waistline area" that Officer Bonczyk thought was a weapon.[32]  Officer Bonczyk testified that he then asked for consent to search Diaz and Hawkins.[33]  Diaz responded, in sum and substance,

---

[28]
> *See* Gov't Ex. 5 at 20:48:13.  With regard to the time stamp on the security footage, testimony at the hearing showed that it was about five minutes delayed, and that, despite stating a time of "20:48:13" when Diaz and Hawkins began walking out of the building, it was in fact around 20:52, or 8:52 p.m. Tr. at 20:21-21:22.

[29]
> *Id.* at 24:17-22, 58:22-59:3.

[30]
> *Id.* at 69:6-70:8.

[31]
> *Id.* at 25:1-12.

[32]
> *Id.* at 25:7-12, 59:4-13.

[33]
> *Id.* at 28:8-17.

7

"Don't fucking touch me.  I'm going to sue you."[34]  Diaz and Hawkins tried to exit through the front

gate but were blocked by the officers.[35]

Seconds later, six additional officers joined Officers Bonczyk and Lopez at the gate.[36]

The group included Officer Cristian Hernandez and Sergeant Alejandra Perez, both of whom had

responded to the first ShotSpotter report.[37]   Two of the officers entered the 936 Building to

investigate.[38]   After about five to ten minutes, they found a shell casing on the roof.[39]   On the

sidewalk, Sergeant Perez spoke to a man walking his dog who said he lived in the 936 Building and

heard a gunshot.[40]   According to Sergeant Perez, the man "motioned with his head" toward Diaz and

Hawkins – both of whom the man said that he saw coming down from the roof – and told her to

"check them."[41]

---

[34]     Compl. ¶ 4(c); *see also* Tr. at 28:8-13.

[35]     Tr. at 28:18-29:3.

[36]     *Id.* at 29:11-16, 33:13-15, 70:15-20.

[37]     *Id.*; *see also id.* at 104:23-105:8, 133:1-15.

[38]     *Id.* at 30:2-18.

[39]     *Id.* at 33:4-10; 73:7-15.

[40]     *Id.* at 108:10-109:1, 115:22-116:9.

[41]     *Id.* at 108:10-109:1.

Meanwhile, Officers Bonczyk, Lopez, and Hernandez separated Diaz and Hawkins and began questioning them on opposite sides of the front vestibule.[42]  Diaz and Hawkins both told the officers that they did not live in the 936 Building,[43] but they provided conflicting information regarding what they had been doing inside.   Though the officers' testimony was somewhat inconsistent regarding what the defendants said, the record establishes to the Court's satisfaction that Diaz said they had been smoking marijuana with a friend on the fifth floor,[44] while Hawkins said they were with his cousin, Daniel Holmes, on the sixth floor.[45]  At some point, Hawkins used his cell phone to call Holmes, who testified that he came downstairs and told officers inside the 936 Building that Diaz and Hawkins had been with him on the sixth floor.[46]  Officers Bonczyk, Lopez, and Hernandez, and Sergeant Perez, testified that although they knew Hawkins made a phone call,

---

[42]

*Id.* at 30:2-12, 71:5-10.

[43]

*Id.* at 71:21-72:7, 140:1-9.

[44]

*Id.* at 31:14-16 (Officer Bonczyk testified that Diaz said he was smoking marijuana at his friend's apartment on the fifth floor); *id.* at 71:21-23 (Officer Lopez testified that Diaz said he was smoking marijuana "in the staircase" with Hawkins).

[45]

*Id.* at 31:17-19 (Officer Bonczyk testified that Hawkins said he was on the sixth floor in his cousin's apartment); *id.* at 72:5-7 (Officer Lopez testified that Hawkins said "he had a family member that lived in the building"); *id.* at 140:1-9 (Officer Hernandez testified that Hawkins said he was visiting family but could not provide the floor number of his family member's apartment).

[46]

*Id.* at 159:6-162:10.  Though body camera footage from the officers who were inside the 936 Building confirmed that Holmes spoke to them, *id.* at 162:12-163:14, Holmes's testimony was weak at best.  While on the stand, Holmes provided inconsistent answers regarding whether he actually lived at the 936 Building – for instance, he was confronted with the fact that he provided police officers with a different "mailing" address on more than one occasion, including when officers spoke to him inside the 936 Building on the night in question.  *Id.* at 165:11-22, 171:17-172:25.  Subsequently, Holmes testified that he lied to officers when he provided them with this mailing address (which was also the address on his identification card).  *Id.* at 172:21-25.

they did not know that Holmes had spoken to officers inside.[47]  The officers testified that, because

Diaz and Hawkins's statements were inconsistent and vague, they did not find them to be credible.[48]

After being informed about the shell casing discovery and the dog-walking witness,

Officer Bonczyk frisked Diaz.[49]  He began with his center waistband area, where he had seen the

bulge.[50]  He recovered an unloaded gun inside a plastic bag in Diaz's groin area and arrested him.[51]

Subsequently, Hawkins was arrested by Officer Hernandez.[52]  When Hawkins asked why he was

being arrested, Officer Hernandez told him it was because he was "together" with Diaz.[53]  Hawkins

was frisked at the scene after his arrest, but no weapons were found.[54]  After searching Hawkins at

the police precinct, officers found a loaded gun in his groin area.[55]  The gun recovered from Hawkins

matched the shell casing officers found on the roof of the 936 Building.[56]

---

[47]      See id. at 32:9-25, 91:6-22, 110:22-111:9, 140:16-25.

[48]      Id. at 31:23-32:2, 72:8-12, 140:10-15.

[49]      Id. at 33:4-35:24.

[50]      Id.

[51]      Id. at 36:9-15, 45:23-46:1.

[52]      Id. at 36:9-15, 142:17-143:4.

[53]      Id. at 144:18-145:13.

[54]      Id. at 143:11-16.

[55]      Id. at 145:17-146:14.

[56]      Id. at 44:8-15.

10

*Analysis*

The defendants argue that the officers violated their Fourth Amendment rights at three points: (I) when the officers stopped them in the front vestibule of the 936 Building, (ii) when they frisked them, and (iii) when they arrested Hawkins.[57]   The Court rejects each of these arguments.

I.     *The Stop*

Under the Fourth Amendment, a law enforcement officer "may conduct a brief investigatory detention – also referred to as a *Terry* stop – as long as the officer has *reasonable suspicion* that the person to be detained is committing or has committed a criminal offense."[58]   A *Terry* stop is "an intermediate response" that allows officers "to pursue a limited investigation when they lack the precise level of information necessary for probable cause to arrest."[59]   Accordingly, the standard by which such a stop is measured is "not high."[60]   It requires only a "reasonable suspicion that criminal activity *may* be afoot."[61]

---

[57]   Defs.' Mem. at 1.

[58]   *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) (quotation marks omitted) (first quoting *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016); and then citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

[59]   *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007).

[60]   *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018) (quoting *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)), cert. denied, 139 S. Ct. 1467 (2019).

[61]   *Id.*

11

A.     *When the Seizure Occurred*

Because grounds for reasonable suspicion must exist at the inception of a *Terry* stop,

the first task is to determine when Diaz and Hawkins were stopped, or "seized," for the purposes of

the Fourth Amendment.[62]

Individuals are not seized under the Fourth Amendment every time they stop and

cooperate with police officers.[63]  Officers "may generally ask [an] individual questions," "ask to

examine [an individual's] identification," and "request consent to search [his or her] luggage"

without any basis for suspecting that the individual has engaged in unlawful conduct.[64]  So long as

officers "do not induce cooperation by coercive means,"[65] these types of interactions are "consensual

encounter[s] that implicate[] no Fourth Amendment interest."[66]  An officer's conduct rises to the

level of a seizure when "(1) a person obeys a police officer's order to stop or (2) a person that does

not submit to an officer's show of authority is physically restrained."[67]

---

[62]

See, e.g., Dancy v. McGinley, 843 F.3d 93, 108 (2d Cir. 2016).

[63]

See, e.g., United States v. Mendenhall, 446 U.S. 544, 554 (1980) ("[C]haracterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.").

[64]

Florida v. Bostick, 501 U.S. 429, 435 (1991) (citations omitted); see also United States v. Drayton, 536 U.S. 194, 201 (2002).

[65]

Drayton, 536 U.S. at 201.

[66]

Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984); see also Drayton, 536 U.S. at 201.

[67]

United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009) (citing United States v. Swindle, 407 F.3d 562, 572 (2d Cir. 2005)).

The defendants effectively obeyed an "order to stop" when Officers Bonczyk and Lopez physically blocked them from leaving the front vestibule, and they cooperated without struggle.  The question thus becomes whether the officers' conduct *before* they blocked the defendants – *i.e.*, when the officers asked the defendants to remove their hands from their sweatshirt pockets and to consent to a search – amounted to a prior "order to stop" that the defendants obeyed.

These initial requests did not amount to an "order to stop" implicating the Fourth Amendment.  An officer's "order to stop constitutes a seizure 'if a reasonable person would have believed that he was not free to leave,' and the person complies with the officer's order."[68]  Officers need not expressly demand that the individual "Halt!" for their conduct to constitute an order to stop – for instance, "loud" and "commanding" demands that an individual stop using a cell phone can suffice.[69]  The key question "is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."[70]  If so, the conduct did not amount to a seizure.[71]

There is nothing on the record to indicate that a reasonable person would not have "fe[lt] free to decline" the officers' requests and "terminate the encounter" when the officers approached the defendants at the front gate.  Officer Lopez testified that the officers interacted with the defendants for all of 15 seconds before they blocked the defendants from leaving.[72]  During

---

[68]     *Simmons*, 560 F.3d at 105-06 (citations omitted) (quoting *Mendenhall*, 446 U.S. at 554).

[69]     *Dancy*, 843 F.3d at 108.

[70]     *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 436).

[71]     *See Drayton*, 536 U.S. at 201-02.

[72]     Tr. at 28:14-29:2.

those 15 seconds, Officer Bonczyk asked the defendants to remove their hands from their sweatshirt pockets, which they obliged, and for consent to search, which they did not oblige. These requests were more indicative of "initial contact between . . . officers and [individuals]" that is "the sort of consensual encounter that implicates no Fourth Amendment interest"[73] than of an order to stop that amounts to a seizure. The requests were not repeated, "loud, commanding,"[74] or made in a "coercive" manner.[75] The defendants clearly felt free to decline at least one of the requests, because both refused – Diaz "somewhat colorfully"[76] – to consent to a search. Likewise, both felt free to terminate the encounter, which they attempted to do before the officers blocked them.

The defendants argue that the seizure was effected when they voluntarily complied with Officer Bonczyk's request to remove their hands from their pockets.[77] But this view misunderstands the effect of their initial compliance. Under Second Circuit law, the analysis is twofold: there must be (I) an "order to stop" that causes a reasonable person to believe that he or she is not free to leave, *and* (ii) the compliance with or physical enforcement of such an order.[78]

---

[73]    See *Rodriguez*, 469 U.S. at 5-6.

[74]    See *Dancy*, 843 F.3d at 108.

[75]    See *Drayton*, 536 U.S. at 201.

[76]    Tr. at 192:18-21. In response to Officer Bonczyk's request for consent to search, Diaz stated: "Don't fucking touch me. I'm going to sue you."

[77]    Tr. at 186:17-24, 188:4-12.

[78]    *Simmons*, 560 F.3d at 105-06; *Swindle*, 407 F.3d at 571-74. After lengthy analysis, the Second Circuit in *Swindle* found that the requirement of compliance with or physical enforcement of the officer's order derived from Supreme Court case law requiring "*either* physical force . . . or, where that is absent, *submission* to the assertion of authority" to effectuate a seizure when the individual flees from police. 407 F.3d at 572 (alteration in

14

Importantly, the requirement that a reasonable person in the circumstances would have believed that he or she was not free to leave is the "*necessary* . . . condition for seizure."[79]  This is clear from *United States v. Simmons*, the case that defendants cited in support of their argument, which found that the defendant was seized the moment he was "not free to leave."[80]  As the Court concludes that a reasonable person in the defendants' circumstances would have felt, and in fact did feel, free to decline the officers' requests and leave, it holds also that no seizure occurred before the officers blocked the exit route.

    *B.*    *Whether Reasonable Suspicion Existed*

       The next issue is whether the officers had reasonable suspicion to stop the defendants when they blocked them from leaving the front vestibule.  The Court concludes they did.

       In reviewing whether a *Terry* stop was supported by reasonable suspicion, a court must ask "whether there was a 'particularized and objective basis' for suspicion of legal wrongdoing under the 'totality of the circumstances.'"[81]  By the time the officers blocked the defendants from leaving the front vestibule, Officers Bonzcyk and Lopez had an objectively reasonable and particularized basis to suspect them of shooting a gun off the roof of the 936 Building.

---

original) (quoting *California v. Hodari D.,* 499 U.S. 621, 626 (1991)).  This is because "[t]he word 'seizure' . . . 'does not remotely apply . . . to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee.'"  *Id.*  Here, there is no question that the defendants submitted to the officers' "assertion of authority."

[79]    *Swindle*, 407 F.3d at 572 (quoting *Hodari D.,* 499 U.S. at 628).

[80]    560 F.3d at 106; *see also* Tr. at 188:4-12.

[81]    *Simmons*, 560 F.3d at 103 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

To begin, the ShotSpotter reports, coupled with the officers' familiarity with and observations of the area, provided "reasonable suspicion that criminal activity may [have] be[en] afoot"[82] in the 936 Building. Before Officers Bonczyk and Lopez arrived on scene, two ShotSpotter reports detected gunfire at roof-level near the 940 Building, which appeared to have no roof access. The officers' testimony established that, in their experience, the address in a ShotSpotter report is approximate: it merely "get[s] you to about the right block."[83] Knowing this, it was reasonable for them to shift their focus to the 936 Building, which they knew from experience shared a wall with the 940 Building, had a history of crime, and had an accessible roof.[84] This finding is bolstered by the fact that the officers who responded to the initial ShotSpotter report, Sergeant Perez and Officer Hernandez, did the very same thing.  Finally, the timing of the defendants' departure from the 936 Building, their body movements while they departed, and Diaz's concealment of a bulge in his groin area provided an objective and individualized basis for stopping the defendants.

The defendants argue that a ShotSpotter report, "standing on its own," cannot be the basis of "individualized suspicion."[85] But the ShotSpotter reports are only two pieces of the calculus.  Officer Lopez testified that the timing of Diaz's and Hawkins's departure from the 936

---

[82]   *Santillan*, 902 F.3d at 56 (emphasis omitted) (quoting *Singletary*, 798 F.3d at 60).

[83]   Tr. at 7:9-11; *see also id.* at 63:10-18, 104:15-22.

[84]   *See Singletary*, 798 F.3d at 60 ("[W]hile a reviewing court cannot merely defer to police officers' judgment in assessing reasonable suspicion, the court must view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training."); *see also Simmons*, 560 F.3d at 108 ("It is a relevant consideration, though by no means dispositive, that the officers, upon arrival, encountered Simmons along with a gathering of people at the apartment building, late at night, and in a high-crime area.")

[85]   *See* Defs.' Reply [Dkt.16] at 2-3 (quoting *Rickmon*, 952 F.3d at 881).

Building linked them to the suspected crime: if a gunshot had been fired at roof level, she thought, it would have taken the shooter about a few minutes to walk down six flights of stairs and exit the building.[86]  That is the approximate amount of time that it took Officers Bonczyk and Lopez to drive to the area and see the defendants exiting.  Moreover, both officers testified that they observed the defendants engage in "nervous, evasive" behavior[87] as they exited: the officers saw Diaz turn his body slightly and Hawkins pivot and hurry as their police car passed.  Subsequently, Officer Bonczyk observed Diaz, whom Officer Lopez recognized from a prior arrest for assaulting an officer, creating tension with his sweatshirt that revealed a bulge that Officer Bonczyk thought was a gun.  These observations provided the officers with reasonable suspicion that, of all the people coming and going from the area that night, Diaz and Hawkins were particularly suspect.

       In his affidavit, Hawkins disputes that he and Diaz engaged in any suspicious behavior when exiting the 936 Building.[88]  At the hearing, defense counsel pointed to the security footage from the 936 Building as showing that "[t]he way these two leave the building is not in any way suspicious."[89]  The security footage, however, showed only a portion of the defendants' passage out of 936 Building, and does not capture them as they reached the front gate and interacted with the officers.  Officers Bonczyk and Lopez's testimony was consistent with respect to what occurred once they met the defendants at the gate, and what they observed the defendants doing.  And

---

[86]     Tr. at 97:13-17.

[87]     *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have . . . recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.").

[88]     Hawkins Decl. ¶ 3.

[89]     Tr. at 193:22-194:4.

although the Court considers Hawkins's affidavit, it affords it less weight than the credible testimony

offered by the officers at the hearing.[90]


II.    *The Frisk*

The facts described above provided the officers with reasonable suspicion to believe

the defendants were "armed and dangerous," justifying the officers in "proceed[ing] from a stop to

a frisk."[91]  Moreover, by the time of Diaz's frisk – about ten to twenty minutes after the officers

arrived – the officers had gathered additional incriminating information.[92]  The officers conducting

the frisk were aware that a shell casing had been found on the roof of the 936 Building.  This

discovery corroborated the second ShotSpotter report and confirmed officers' suspicions that a

gunshot had been fired from of the 936 Building, from which the defendants had exited, rather than

the 940 Building.  The officers' suspicions were heightened when the defendants provided

---

[90]
See generally United States v. Rodriguez, 368 F. App'x 178, 180 (2d Cir. 2010) ("Although defendant submitted an affidavit . . . it was not clearly erroneous for the District Court to credit the officers' testimony over defendant's affidavit."); DiMattina v. United States, 949 F. Supp. 2d 387, 410-11 (E.D.N.Y. 2013) ("DiMattina has chosen not to testify in his own defense. That is his constitutional right. Yet, he cannot use that right as shield to protect him from potential criminal liability while concomitantly wielding his affidavits as a sword to cast doubt on testimony found credible by the court as fact-finder. Without the threat of cross-examination, DiMattina's affidavits are viewed as self-serving and given little weight."); United States v. Al-Marri, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) ("Consequently, this Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to Al-Marri's version of the facts.").

[91]
See Arizona v. Johnson, 555 U.S. 323, 326-27 (2009).

[92]
Tr. at 33:1-3, 93:11-14.  Diaz was frisked first.  *Id.* at 35:18-36:17.  After Diaz was found with a gun and arrested, Hawkins was arrested and subsequently frisked.  *Id.* at 35:18-36:17, 143:11-16.  On top of the additional incriminating information described above, by the time of Hawkins's frisk, the officers knew also that Hawkins had been exiting an area where apparent gunfire was detected with someone who had a gun.

18

inconsistent answers about what they had been doing in the building.[93]  Finally, the dog walking

witness, who said he heard gunshots and saw the defendants coming down from the roof, provided

additional individualized suspicion that connected the defendants to the suspected crime.


III.    *The Arrest of Hawkins*

Lastly, Hawkins argues that his gun should be suppressed because Hawkins's arrest,

and the resulting search incident to arrest, independently violated the Fourth Amendment.  The

Court disagrees.

A search incident to an arrest is unlawful under the Fourth Amendment if the arrest

is not supported by probable cause.[94]  Probable cause exists where an officer has "sufficient

knowledge or reasonably trustworthy information to justify a person of reasonable caution in

believing that an offense has been or is being committed by the person to be arrested."[95]

By the time the officers arrested Hawkins, they had sufficient knowledge and

reasonably trustworthy information to believe that he either had fired a gun from the 936 Building's

---

[93]    With regard to Holmes's testimony that he told officers inside the 936 Building that the
defendants had been with him on the sixth floor, the officers who frisked and arrested the
defendants testified that they were not aware of Holmes's statements to the officers inside.
In any event, even if one assumes that the officers knew of Holmes's statements, they were
entitled to rely on the other incriminating evidence they gathered, which linked the
defendants to the gunshot report.  *See United States v. Padilla*, 548 F.3d 179, 187 (2d Cir.
2008) (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) ("[C]onduct that
is 'as consistent with innocence as with guilt may form the basis for an investigative stop
where there is some indication of possible illicit activity.'").

[94]    *See United States v. Robinson*, 414 U.S. 218, 224-26 (1973).

[95]    *United States v. Steppello*, 664 F.3d 359, 364 (2d Cir. 2011) (quotation marks omitted)
(quoting *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004).

roof or intentionally aided Diaz or someone else in doing so.  The second ShotSpotter report placed him at a high crime building with a known, accessible roof at about the time it would have taken a potential shooter to descend.  The officers observed him engaging in nervous, evasive behavior when they approached.  A witness informed the officers that he saw Hawkins coming down from the roof.  The officers recovered a bullet casing on that roof.  And Hawkins admitted to being inside the building with Diaz, who was found with a gun.

Hawkins's argument that his mere proximity to Diaz cannot support a finding of probable cause ignores the number of other pieces of evidence that connected Hawkins to the shooting.  In this regard, his circumstance is distinct from the circumstance of the defendant in the case he cites, *Ybarra v. Illinois*.[96]  There, the Supreme Court held that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."[97]  But here, Diaz was not independently suspected of criminal activity: the officers testified that they suspected Diaz and Hawkins committed the shooting together.[98]  And, in any event, the officers' suspicion of Hawkins was supported by additional evidence gathered during their step-by-step investigation, which connected Hawkins to the crime.

---

[96]      444 U.S. 85 (1979).

[97]      *Id.* at 91.

[98]      *See, e.g.*, Tr. at 144:18-145:10.

20

Accordingly, once the officers discovered the gun on Diaz, they reasonably believed that Hawkins was not merely an innocent bystander.

*Conclusion*

For the foregoing reasons, Defendants' motion to suppress [Dkt. 12] is denied.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated:       October 14, 2020

 

 

Lewis A. Kaplan
United States District Judge